**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Augusta, Georgia
*By jpayton at 4:04 pm, Sep 29, 2015*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Augusta Division

|                              |     |                        |
|------------------------------|-----|------------------------|
| IN RE:                       | )   | Chapter 7 Case         |
|                              | )   | Number <u>13-10860</u> |
| WILLIAM JEFFREY BROOKS,      | )   |                        |
|                              | )   |                        |
|     Debtor | ) |                        |
|                              | )   |                        |

## OPINION AND ORDER

Before the Court is William Jeffrey Brooks' ("Debtor") objection to Gwinnett Community Bank's ("Gwinnett") proof of claim. Debtor argues his purported signature on the guaranty is a forgery and therefore he is not liable for this debt. This is a core proceeding under 28 U.S.C. §157(b)(2)(B) and the Court has jurisdiction pursuant to 28 U.S.C. §1334. For the following reasons, Debtor's objection to claim is denied.

## FINDINGS OF FACT

In 2006, International Hospitality, LLC ("International") borrowed $3,195,400.00[1] from Gwinnett. Debtor had an ownership interest in International and this dispute arises out of Debtor's obligation, if any, under a personal guaranty purportedly executed by the Debtor in connection with this loan. Debtor claims his

---

[1] This amount was subsequently increased.

signature on the guaranty is a forgery.  Gwinnett disagrees and contends it holds a valid and fully enforceable guaranty from Debtor.

At the hearing on the objection to claim,[2] Gwinnett presented evidence from pre-petition state court litigation between

---

[2]  At the commencement of the hearing, Gwinnett orally moved for the first time for a continuance contending it needed additional time to prepare and that it did not realize this was an evidentiary hearing.  This motion was denied.  The objection to claim was specially set and duly noticed on December 8, 2014 for hearing on January 9, 2015 to consider Debtor's objection to the claim.  On the afternoon of January 8, 2015, the day before the hearing, Gwinnett filed a motion for a scheduling order and for consolidation of the objection to claim with its adversary proceeding.  Dckt. No. 394. Debtor appeared at the January 9, 2015 hearing on the objection to claim with his witnesses and was ready, willing and able to proceed. Debtor strenuously opposed any continuance arguing he had arranged for his witnesses, including an expert, to travel and appear and he wanted to get this matter behind him.
General Order 2003-1 for the Southern District of Georgia states, "unless the notice of hearing provides to the contrary, all hearings before the court are evidentiary hearings at which witnesses may testify." Gen. Order 2003-1 (Bankr. S.D. Ga. Feb. 7, 2003).  The notice of hearing on this matter did not provide otherwise.  Dckt. No. 361.  Well before the January hearing date, on April 30, 2014, Gwinnett filed an 11 U.S.C. §523 and §727 adversary proceeding against Debtor.  See Adv. Proc. No. 14-01015.  In this adversary proceeding, the deadline for discovery had closed and Debtor argued Gwinnett had known about his handwriting expert since October 2014 as forgery was his defense in the adversary.  See Adv. Proc. No. 14-01015, Dckt. Nos. 28 and 29.  Given that discovery had expired in the adversary proceeding and the hearing had been scheduled and noticed for more than a month, Gwinnett was not surprised by witnesses offering testimony, or that this was to be an evidentiary hearing.  Furthermore, Gwinnett's request for a continuance and its motion for a scheduling order and consolidation were delayed and untimely.  For these reasons and those set forth on the record at the hearing, the motion for continuance was denied.

2

Gwinnett and Debtor wherein the jury returned a verdict in Debtor's favor finding Debtor's purported signature on the guaranty was forged. ("the State Court litigation"). Subsequent to the verdict, Gwinnett learned Debtor apparently greatly exaggerated his military service record when he testified during the State Court litigation. Ultimately, the State Court Judge granted Gwinnett's request for a new trial stating:

> At trial, the jury's determination of [Debtor's] credibility was central to the verdict. In fact, the jurors' belief that [Debtor] received a Bronze Star for Valor might have critically, if not wholly, influenced the jury in determining [Debtor's] moral character and credibility. Having presided over the trial of the case, the Court finds that absent [Debtor's] bolstering and untruthful testimony, the jury's verdict would probably have been different, particularly if coupled with the additional new testimony by Mr. [Giorgio] Medici.[3]

Tr. 1/09/2015, Creditor Ex. 1. After the entry of the State Court order granting a new trial but before the new trial was held, Debtor filed this bankruptcy case. At the hearing on the objection to claim in this Bankruptcy Court, Debtor invoked his 5th Amendment

---

[3]   The State Court Judge noted that Mr. Medici had not been located throughout the course of the State Court litigation despite Gwinnett's due diligence efforts to locate him. After the conclusion of the State Court trial, Gwinnett located and deposed Mr. Medici and was able to attend Mr. Medici's §341 Meeting of Creditors.

AO 72A
(Rev. 8/82)

rights when asked about his military record.

At the hearing, Debtor's handwriting expert, Arthur T. Anthony was admitted and qualified, without objection, as an expert Forensic Document Examiner.[4] After comparing numerous instances of Debtor's known signatures with the signature on the Gwinnett guaranty, Mr. Anthony concluded Debtor's purported signature on the guaranty is a forgery. Mr. Anthony points to several differences between the signature on the guaranty and Debtor's known signature samples. He states that unlike the Debtor's known signature which is rapid and fluid, evidencing a pen moving rapidly across the paper, the signature on the Gwinnett guaranty has a somewhat pressured upward motion with a splice (pen lifted off paper and placed back down) and a small check mark-like character on the guaranty that is blunt and not fluid. Tr. 1/09/2015, 204. He also states there are similar blunt hesitations in the second (middle initial) and third (last name) formations of the questioned William J. Brooks signature. Id. at 206. Mr. Anthony testified these

---

[4] Mr. Anthony has considerable experience as a Forensic Document Examiner. He has worked for the Federal Bureau of Investigation, the Illinois Department of Law Enforcement, and the Georgia Bureau of Investigation from 1981 to 2009, where he was Chief Forensic Document Examiner and Manager of Questioned Documents and Forensic Imaging Section. He has been certified by the American Board of Forensic Document Examiners since 1984. Mr. Anthony has written numerous publications on handwriting and indicated he has testified in hundreds of cases on such matters. Debtor's Ex. 2A.

discrepancies are classic signs of forgery, perhaps even evidencing a tracing of Debtor's actual signature as there is a faint indented outline around the original ink signature.  All of these factors led Mr. Anthony to conclusively and confidently opine Debtor's purported signature on the Gwinnett guaranty is a forgery.  Tr. 01/09/2015, 211 and 218-19.

Without objection, Gwinnett tendered into evidence the report of its handwriting expert, Mr. Brian Carney, also a Forensic Document Examiner.  Mr. Carney conducted:

> Microscopic, macroscopic and side by side comparison examinations . . . . Among the features considered in the analysis, comparison, and evaluation of the questioned and known writings were elements of the writing including alignment, arrangement, formatting and position, capitalization, connectedness and disconnectedness, cross strokes and dots, and punctuation, direction of strokes, embellishments, formation, freedom of execution, legibility, line quality, method of production, overall pressure and patterns of pressure emphasis, proportion, simplification, size, skill, slant, or slope, spacing, speed, initial, connecting, and terminal stokes, tremor, type of writing and range of variation . . . . lifts, stops and hesitations of the writing instrument, patching and retouching, slow, drawn quality of the line, unnatural tremor, and guide lines of various forms.

Creditor Ex. 11.  Some of the basic principles upon which his examination is based is that "each writer has a range of variation centered within his/her basic writing habits . . . . [N]o mature

5

writer ever writes _exactly_ the same way twice . . . . [T]his is referred to as natural variation or 'intra-writer' variation." Creditor Ex. 11.  (emphasis in original).

Based upon his examination, Mr. Carney concludes, "there are indications . . . [Debtor] wrote the questioned signatures appearing on the [guaranty]." Creditor Ex. 11.  In his report, Mr. Carney defines "indications" as "a body of writing [that] has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing [of known signatures]." Creditor Ex. 11.

Mr. Carney opines that Debtor's signature is one that is a simple signature, easily forged and therefore no expert could be certain whether a purported signature of the Debtor's is a forgery or genuine.  Tr. 01/09/2015, 218-219.  He concludes there are indications that Debtor wrote the signature in question, but he could not definitively state whether it is or is not Debtor's signature on the guaranty.

Mr. Carney's report notes the splice observed in Debtor's purported signature on the Gwinnett guaranty and he examined the paper finding a "microscopic examination near the pen stop shows that the ball of the writing instrument 'punched' through the paper. This type of characteristic can be explained by an uneven writing

6

surface or obstacle in the path of the writing instrument which can make the writer inadvertently change direction." Creditor Ex. 11. According to Mr. Carney's report, two of Debtor's known signatures used for comparison purposes also have an indented signature of Debtor. Creditor Ex. 11.

As for methodology, Mr. Carney used a ten point scale and Mr. Anthony, Debtor's expert, used a seven point scale. Mr. Anthony stated the seven point scale he uses eliminates the "probable" from both ends of the forgery/genuine spectrum. Tr. 01/09/2015, 218.

Mr. Anthony disagrees with Mr. Carney's assessment that a forgery of Debtor's signature would be difficult to identify and with Mr. Carney's statement that no expert could be certain whether the purported signature was a forgery. Mr. Anthony characterizes Mr. Carney's opinion as a "grey area opinion," not definitive. Id.

Debtor also called Kevin Cape as a witness. Like Debtor, Mr. Cape also held an ownership interest in International along with Giorgio Medici. At the time in question there were several members of International, including Debtor, Mr. Cape, Mr. Medici, and Reuben Chandler. Mr. Cape acknowledges that he signed a personal guaranty for this loan, but states that he never saw Debtor sign the guaranty. Mr. Cape has known Debtor over 15 years and has been involved in many building projects with Debtor. Mr. Cape testified

7

that Debtor and Mr. Medici had an argument about International undertaking the Pendergrass project from which this guaranty arises. Mr. Cape states Debtor vehemently opposed and voted not to undertake the Pendergrass project and further indicated he did not want to be a part of the project. Mr. Cape was unable to recall if Debtor said he would not sign the guaranty. Mr. Cape also testified that Mr. Medici had no credibility with him because he believes Mr. Medici cheated him out of thousands of dollars.

Both Debtor and Mr. Cape acknowledge that Mr. Medici, as the sole manager of International, had the authority to sign the promissory note, but neither Debtor nor Mr. Cape ever gave Mr. Medici permission to sign their names to any personal guaranty. As such, Debtor acknowledges he is responsible for the promissory note to the extent of his ownership interest in International, but disputes ever signing the guaranty or giving Mr. Medici or anyone else authority to sign his name thereon. Mr. Medici states all members of International signed their respective names on the personal guaranty and that he saw Debtor sign the guaranty. Tr. 01/09/15, 157 and 160.

Joe Godfrey ("Godfrey"), vice president of Gwinnett, testified the Gwinnett loan to International stemmed from his relationship with Debtor and Reuben Chandler. Godfrey was the loan

8

officer and stated he had known Debtor since kindergarten (over 25 years) and that over the years Gwinnett had provided Debtor many construction loans, personal loans, as well as an acquisition and development loan for an entity in which Debtor was involved.  Tr. 01/09/15, 111.  In all these business loans, Gwinnett always required a personal guaranty.  Id.  Based upon his long time friendship with Debtor, and his knowledge of Debtor's signature on many bank documents, Godfrey testified that he is familiar with Debtor's signature and believes the signature on the guaranty is Debtor's.  He states Gwinnett would not have made the loan to International without personal guaranties from all of International's members, including Debtor.  Id. at 115.

Debtor acknowledges that as long as he banked with Godfrey at Gwinnett personal guaranties were required.  Id. at 86.  Debtor also acknowledges he knew of the Gwinnett loan to International. Id.  Nevertheless, Debtor disputes signing the guaranty in connection with this loan.

Godfrey acknowledges that the project was never completed and that he is unaware of Debtor receiving any money or benefit from the Pendergrass project.  Tr. 01/09/15, 140.  Godfrey also testified he never saw Debtor on the site in any supervisory or financial role.  Id.  Mr. Cape was the on-site construction manager, not

9

Debtor. Id. at 129.

Godfrey confirms Debtor approached him in 2007, approximately a year after the loan was made, requesting to be released from his personal guaranties with Gwinnett because he had been "bought out" of International and was moving to south Georgia. Tr. 01/09/15, 117. Godfrey also admits he wrote remarks in the bank's internal meeting notes on three occasions that Debtor had been released from the Pendergrass guaranty due to Debtor selling his interest in International; however, Godfrey states these notations were entered in error and that Gwinnett never executed a written release of Debtor, or communicated to Debtor that he was released from his obligations on the guaranties. Id. at 122-23. Godfrey also testified that he informed Debtor he did not have the authority to release Debtor from these obligations and would have to submit the request to his superiors.

Godfrey also confirms that Mr. Medici signed a second note on behalf of International for an additional $400,000.00 for sewer taps for the Pendergrass project. Gwinnett only required Mr. Medici to sign a personal guaranty in connection with this $400,000.00 note. Godfrey states that requiring another guaranty was done out of an "abundance of caution." Id. at 136-137.

At the hearing, Gwinnett and Debtor offered portions of

10

the transcripts from Mr. Medici's §341 meeting conducted August 1, 2012[5] and his April 15, 2013 deposition taken in connection with the State Court litigation, case no. 09-13437, <u>Gwinnett Community Bank v. International Hospitality, LLC</u>.[6]   This testimony was provided four to five years after the Gwinnett loan was entered.   In these transcripts, Mr. Medici's testimony, taken as a whole, about the execution of the loan documents is unclear and often prefaced with qualifications such as "if I recall" and "if I remember".   At one point Mr. Medici states that Debtor, Mr. Cape, Reuben Chandler, and Mr. Medici all went to Gwinnett together to meet with Godfrey about obtaining the loan for the Pendergrass project.   Tr. 01/09/15, 155, Dckt. No. 437.   Mr. Medici also states if he recalls right all of the members of International signed personal guaranties and if he recalls correctly Debtor, Mr. Medici, Mr. Chandler and Mr. Cape attended the closing together.   Tr. 01/09/15, 157-158.   Debtor and Mr. Cape deny attending the closing.   The closing attorney's affidavit states that to the best of his recollection, Mr. Medici was the only person attending the closing.   The closing attorney's affidavit also indicates his office faxed the guaranty to

---

[5]   Chapter 7 bankruptcy case no. 12-67154-BEM, Northern District of Georgia.

[6]   Both Debtor and Gwinnett agreed Mr. Medici likely would not appear in this Bankruptcy Court even if subpoenaed.   Apparently, he was very difficult to locate for the State Court litigation.

International's office for execution and Mr. Medici presented the signed guaranty to him.  Tr. 01/09/15, Debtor's Ex. 2.  Gwinnett concedes that Debtor was not at the closing.  When Mr. Medici's memory was refreshed, he stated to the best of his recollection when the guaranty was faxed to the office, "I signed, Reuben signed, Jeff signed, Kevin signed, Kevin Cape signed.  Then I took for sure the paper with me with the original signatures because I met with Michael Gerster and I met with Jayesh Patel and I met with Harish Jadav to let them sign an original.  Specifically, I recall we mailed to Mr. Ramesh Amin and this one Jayesh Patel did.  He mailed it to Ramesh because he was living in Florida." Tr. 01/09/15, 159. Again, Mr. Medici stated that he personally saw Debtor sign the guaranty.  Id. at 160 ("we were there at the office signing, all of us, all four.").  Both Debtor and Mr. Cape deny that all four of them were collectively at the office signing the guaranty.

Mr. Medici also claims that it was the policy of International that every member had to consent to a project before the company would commence a building project.  Tr. 01/09/15, 157. Mr. Medici states Debtor never opposed the project or said he would not sign the guaranty.  Id. at 157.  Both Debtor and Mr. Cape indicate Mr. Medici's testimony is not credible.

The initial $3.9 million dollar loan from Gwinnett to

12

International closed in July 2006. It is undisputed Debtor was a member of International at the time this loan was closed. Debtor claims he sold his interest in International[7] to Mr. Medici in March 2007 as evidenced by the Equity Purchase Agreement. Tr. 01/09/2015, 88, Creditor Ex. 4. Paragraph (d) of the Equity Purchase Agreement provides:

> Medici, acknowledging that any loans to the companies of which interests are being transferred have been personally guaranteed by [Debtor], hereby agrees to take any necessary action to have [Debtor] released of any and all personal guaranties, at or prior to closing.

Tr. 01/09/2015, 88, Creditor Ex. 4. Debtor's testimony about this language in regards to International is confusing. He acknowledges asking Godfrey to be released from his personal guaranties with Gwinnett and claims to have been released by Gwinnett. Tr. 01/09/2015, 90. However, he disputes ever going to Gwinnett with Mr. Medici to obtain a release of this loan. Id. at 90 and 96. When explaining the intent of this provision in the Equity Purchase Agreement, Debtor claims the purpose was to be released from other unspecified loans he purportedly guaranteed with Gwinnett and it did not involve the Pendergrass loan. Tr. 01/09/2015, 91-92, 96. Yet,

---

[7]     The parties agree the Equity Purchase Agreement addresses Debtor's sale of his ownership interest in International as well as several other entities. Creditor's Ex. 4, ¶(b).

13

in August 3, 2009, in response to Gwinnett's deficiency letter regarding the Pendergrass loan, Debtor directed Gwinnett to this paragraph (d) of the Equity Purchase Agreement. Tr. 01/09/2015, 93-94, Creditor Ex. 7. Debtor did not challenge the fact of whether he signed the guaranty referenced in the deficiency letter. In fact, Debtor also failed to raise forgery as a defense in his answer in the pre-petition State Court litigation. Debtor states his failure to raise the forgery defense in his initial State Court litigation pleadings was a trial strategy and he did not know of the forgery until the discovery process when he actually reviewed a copy of the guaranty. Id. at 134-36, 179.

### CONCLUSIONS OF LAW

Pursuant to 11 U.S.C. §502 a proof of claim is deemed allowed if not objected to by a party in interest. 11 U.S.C. §502(a). A timely filed proof of claim is prima facie evidence of the amount and validity of the claim. Fed. R. Bankr. P. 3001(f). An objecting party has the burden of negating the prima facie validity of the proof of claim. Hon. W. Homer Drake, Jr., Hon. Paul W. Bonapfel & Adam M. Goodman, Chapter 13 Practice and Procedure §18:5 at 657 (2013-2 ed.). "If the objecting party overcomes the prima facie case, then the burden of proof falls to the party that would bear the burden outside of bankruptcy." In re Walston, 606 F.

14

App'x 543, 546 (11th Cir. June 2, 2015) citing Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000); In re Zierke, 2015 WL 1541317, at *4 (Bankr. N.D. Iowa April 1, 2015)(objector must put forth substantial evidence that deprives the claim of its presumptive validity, once this burden is met the burden shifts to claimant to validate the claim); 9 Collier on Bankruptcy ¶3001.09[2] (16th ed. 2015)("Upon introduction of sufficient evidence by the objecting party, the burden of proof will fall on whichever party would bear that burden outside of bankruptcy."); Hon. W. Homer Drake, Jr., Hon. Paul W. Bonapfel & Adam M. Goodman, Chapter 13 Practice and Procedure §18:5 at 657-58 ("The creditor [ ] has the burden of proving the validity of its claim by a preponderance of the evidence, unless the applicable nonbankruptcy law allocates the burden of proof on the claim differently. If the debtor does not produce enough evidence to overcome the prima facie validity of the claim, the burden does not shift to the claimant.").

Debtor argues he is not liable on the debt because he did not sign the guaranty, authorize anyone to sign the guaranty on his behalf, or ratify the loan. Georgia's Uniform Commercial Code states in pertinent part:

> In an action with respect to an instrument, the authenticity of and authority to make each signature on the instrument is admitted unless specifically denied in the pleadings. If the

> validity of a signature is denied in the
> pleadings, the burden of establishing validity
> is on the person claiming validity, but the
> signature is presumed to be authentic and
> authorized unless the action is to enforce the
> liability of the purported signer and the
> signer is dead or incompetent at the time of
> trial of the issue of validity of the
> signature.

O.C.G.A. §11-3-308(a).  The comments to O.C.G.A. §11-3-308 further

explain the shifting burden:

> The burden is on the party claiming under the
> signature, but the signature is presumed to be
> authentic and authorized except as stated in
> the second sentence of subsection (a).
> "Presumed" is defined in Section 1-201 and
> means that until some evidence is introduced
> which would support a finding that the
> signature is forged or unauthorized, the
> plaintiff is not required to prove that it is
> valid.  The presumption rests upon the fact
> that in ordinary experience forged or
> unauthorized signatures are very uncommon, and
> normally any evidence is within the control of,
> or more accessible to, the defendant.  The
> defendant is therefore required to make some
> sufficient showing of the grounds for the
> denial before the plaintiff is required to
> introduce evidence.  The defendant's evidence
> need not be sufficient to require a directed
> verdict, but it must be enough to support the
> denial by permitting a finding in the
> defendant's favor.  Until introduction of such
> evidence the presumption requires a finding for
> the plaintiff.  Once such evidence is
> introduced the burden of establishing the
> signature by a preponderance of the total
> evidence is on the plaintiff.  The presumption
> does not arise if the action is to enforce the
> obligation of a purported signer who has died
> or become incompetent before the evidence is

16

required, and so is disabled from obtaining or introducing it.

O.C.G.A. §11-3-308(a), cmt. 1; see Thomas v. Summers, 764 S.E.2d 578, 580 (Ga. Ct. App. 2014); see also Lee v. SunTrust Bank, 722 S.E.2d 884 (Ga. Ct. App. 2012).

Under applicable Georgia law, to rebut the prima facie validity of the signature on the guaranty, Debtor must come forth with substantial probative evidence establishing by a preponderance of the evidence that:

1) the signature was not written by Debtor; and

2) the signature was not Debtor's act or deed, or done with his authority. See White v. Georgia RR Bank & Trust, 30 S.E.2d 118, 120 (Ga. Ct. App. 1944)(establishing "that the signature on the check was not written by the depositor and was not his act and deed, were sufficient to charge that the check in question was a forgery."); Fountain v. McCallum, 21 S.E.2d 610, 611 (Ga. 1942)("the judge did not err in charging [the jury] that if they found that the plaintiff did not sign the deed or did not authorize any one to sign the deed for her, it would be a forgery"); Owenby v. Stancil, 8 S.E.2d 7 (Ga. 1940)(forgery found where signature was not being put on the acknowledgment of service of notice by the plaintiff or with her authority or consent); Heard v. Lovett, 538 S.E.2d 434, 435 (Ga. 2000); see also, In re Chism, 57 B.R. 23 (Bankr. M.D. Ala. 1985)

17

(debtor's objection to claim sustained where the debtor established signature on guaranty was a forgery).

Even if Debtor establishes his signature was forged and not authorized by him, he may still be found liable if Gwinnett establishes the guaranty was ratified. See Ferguson v. Golf Course Consultants, Inc., 252 S.E.2d 907 (1979)(Ratification of forged deed was proven where a partner's name was signed by his business partner without his authority but he later accepted a check for part of the proceeds); see also FDIC v. CGS Partners, II, LLC, 2011 WL 1790800 at *2 (N.D. Ga. May 9, 2011)(if a principal knows of an act of an agent and does not object within a reasonable time, ratification of the act by operation of law occurs).

After considering and weighing all of the testimony and observing the witnesses, the Court finds Gwinnett ultimately carried its burden of proof as to the validity of its proof of claim. First, considering the testimony, reviewing the signature on the guaranty, and experts' conclusions, the Court concludes this signature is not a forgery. Gwinnett's expert, Mr. Carney concluded there were indications that the signature was genuine. Mr. Carney opined because Debtor's signature is a simple signature, it is easily susceptible to forgery and no expert could conclusively conclude the signature was authentic or forged. As a result, Mr.

18

Carney concluded based upon a scale from 1 to 10 there were indications it was Debtor's genuine signature.  In his report, Mr. Carney defined "indications" as "a body of writing [that] has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing [of known signatures of Debtor]."  Creditor Ex. 11.

Mr. Carney's explanation as to why it is difficult to conclude the signature is forged is credible, and comports with the Court's own observations.  Mr. Carney's report states, "microscopic examination near the pen stop shows that the ball of the writing instrument 'punched' through the paper.  This type of characteristic can be explained by an uneven writing surface or obstacle in the path of the writing instrument which can make the writer inadvertently change direction."  Creditor Ex. 11.  Mr. Carney's explanation that the splice could be the result of the guaranty being signed on a stack of papers causing Debtor to exert more pressure that punctured the paper also is credible.  Tr. 01/09/2015, 215-16; Creditor Ex. 11.  As for the indentations that Mr. Anthony concluded may be evidence of tracing, Mr. Carney found two of the Debtor's known signature samples also had indentations possibly evidencing a party signing a stack of papers with indentations carrying over onto other pages.  Tr. 01/09/2015, 215-16; Creditor

Ex. 11.

Basically, the process undertaken by the experts is a visual side by side comparison. Tr. 01/09/2015, 220-21. Mr. Carney used a ten point scale finding indications the questioned signature was Debtor's signature. Conversely, Debtor's expert used a seven point scale eliminating probable on both sides of the spectrum. Tr. 01/09/2015, 218. While Debtor's expert characterized Mr. Carney's opinion as a "grey opinion" and confidently concluded and opined that Debtor's signature was a forgery, the Court is not bound by either expert's opinion. "Expert testimony is intended to aid the [factfinder] in reaching the correct conclusion on a particular issue, but [the factfinder] is not bound by the expert's opinion and is entitled to give the testimony such credit as it deems appropriate." Allen v. Spiker, 689 S.E.2d 326, 329 (Ga. Ct. App. 2009). After considering and reviewing all of the evidence, the Court finds the signature is not a forgery.

This matter involves a commercial transaction with a purported personal guaranty of more than $3,000,000.00 and the Court does not find it credible that someone with Debtor's experience and acumen would not remember if he signed such a guaranty, even in the real estate boom markets of the early 2000s. This is especially true, if Debtor was so vehemently opposed to the Pendergrass project

from the onset and had "heated" discussions opposing undertaking the Pendergrass project.   Debtor is an intelligent business man and given this background, surely he would know he did not sign this particular guaranty.   His initial pro se responses to Gwinnett's counsel's ten-day letter on the Pendergrass note and guaranty, made less than three years after the loan was made, fail to include Debtor's claim that he did not sign the guaranty.   Rather, Debtor's response to the default letter points to the fact that his interest in International was acquired by Mr. Medici specifically referring to paragraph (d) of the Equity Purchase Agreement which provides:

> Medici, acknowledging that any loans to the companies of which interests are being transferred have been personally guaranteed by Brooks, hereby agrees to take any necessary action to have Brooks released of any and all personal guaranties, at or prior to closing.

Tr. 01/09/2015, 88, Creditor Ex. 4.   With claims of such a heated dispute concerning the Pendergrass project, the Court does not find it credible that Debtor would not challenge the validity of the guaranty until examining the guaranty in connection with the subsequent litigation filed by Gwinnett.   When questioned about his failure to initially raise this as an affirmative defense at trial, Debtor said it was a trial strategy to pursue "release" as a defense and he did not recognize the forgery until he saw a copy of the guaranty during discovery.   This may have been a trial strategy, but

21

it is not credible that he would not raise this in his initial pro se response to the demand letter.

Godfrey testified that while with Gwinnett, he made numerous loans to Debtor and his non-International entities, always requiring personal guaranties. Godfrey testified that Debtor understood a personal guaranty was required in connection with the Gwinnett loan to International. Debtor acknowledged that as long as he banked with Godfrey at Gwinnett personal guaranties were required. The parties acknowledge Debtor approached Godfrey in 2007 about obtaining releases from Gwinnett of his personal guaranties. Debtor states this request was related to his guaranties for non-International loans but fails to identify any specific outstanding loans with Gwinnett other than the one related to the Pendergrass project. Godfrey stated the International loan was included in this request. Debtor met with Godfrey to discuss his request for release after Debtor had purportedly been bought out of International. In fact, Debtor points to internal bank notes where Godfrey noted Debtor was released from the International guaranty.[8] With this background, the Court does not find it credible that Debtor did not

---

[8] In this Bankruptcy Court proceeding, the parties agree Debtor's purported "release" from Gwinnett's debt was litigated in State Court and the State Court held Debtor was not released from the purported guaranty.

AO 72A
(Rev. 8/82)

know he was obligated on this personal guaranty.

For the foregoing reasons, after considering all the evidence and demeanor of the witnesses, the Court finds Gwinnett has carried its burden of proof and established this is Debtor's personal guaranty and therefore, Debtor's objection to claim is ORDERED DENIED and Gwinnett's proof of claim is ORDERED ALLOWED.

_Susan D. Barrett_
SUSAN D. BARRETT
CHIEF UNITED STATES BANKRUPTCY JUDGE

Dated at Augusta, Georgia
this **29th** day of September, 2015.

23